This video was made in Cooperation with the U.S. Department of Health and Human Services.  This video was made in Cooperation with the U.S. Department of Health and Human Services. If you're ready. After 69 pages and eight factual findings that Barr does not contest, the district court concluded that the skilled person would have to experiment to see if the claimed invention would work. Thus affirming here would work a fundamental change in the law of obviousness because the district court read predictability out of KSR. In its conclusion on page A70 after discussing the eight factual findings, the district court concluded that the skilled person would have concluded that a bioavailability test should be undertaken, which as it is now known would have confirmed that drosperinone absorbs and is bioavailable. In addition to this legal error lowering the standard for obviousness, the district court also made three clear factual errors that led to an erroneous gram analysis. And without these errors, Barr cannot meet its burden of proof. To frame these legal and factual errors, let us focus on the problem to be solved. How to formulate drosperinone as an oral contraceptive. The first characteristic of drosperinone is that it's poorly water soluble, has trouble dissolving. The prior art taught that you can use micronization. You can grind up the active ingredient into smaller particles to help it dissolve more readily. But the prior art also warned that this affects the second characteristic of drosperinone. It's acid sensitive. In acid, drosperinone breaks down, degrades, does not work. And the prior art warned that micronizing drosperinone to address poor water solubility would exacerbate, make worse, the problem of acid degradation due to drosperinone's acid sensitivity. So the question in this case is whether the skilled person could reasonably predict success with a low dose micronized acid sensitive drosperinone dissolving in stomach acid and yet be effective as an oral contraceptive. Now the district court lowered the standard for obviousness, did not apply KSR's predictable solutions test and instead applied a let's test and see standard. We know this because the district court found that micronization was uncertain. This is at A44. Alton recognizes the uncertainty of micronizing and that micronization may increase the extent of acid degradation. So the court found the skilled person would have to test to see whether micronization would lead to more degradation. And we know that the district court did not find that the prior art predicted the success of the claimed invention in advance of the testing. This is shown, for example, on page A56 of the court's opinion. Here the court is discussing the Krause references. These are the references that Barr contends are the closest prior art in the case. And having considered the Krause references, the district court says drosperinone may absorb and due to the differences in drug dose amount, water load, and therapeutic use, the person of ordinary skill in the art would perform independent in vitro, in vivo testing. The skilled person would have to test. And this is confirmed again after the discussion of nickish and isomerization. The district court concludes that the skilled person would know isomerization rate varies and gastric emptying time varies. And therefore, page A61, whether drosperinone absorbed or isomerized requires verification through precise in vivo and in vitro testing. The skilled person would have to test. Cannot predict in advance of the testing what will happen. We also know from the court's conclusion that the court had an impermissible state of mind. Hindsight. We know this from the phrase on A70 in the ultimate conclusion on obviousness that the bioavailability test should be undertaken, which as it is now known, would have confirmed. So the district court was looking at the claimed invention and saying, as it is now known, using hindsight throughout the analysis of the prior art to inform. That's an impermissible state of mind and a legal error. In addition, the district court did not consider the subject matter as a whole as, for example, on page A68 where the court writes micronization is obvious. Now, the subject matter as a whole must be considered. And obviousness is a determination about subject matter as a whole, not one limitation of the claim. Turning to obvious to try, the district court had an alternate holding. And it erred again because it lowered the standard of obviousness and didn't apply predictable solutions. Instead, at A70, the district court wrote about finite choices. It found where there are finite choices and it's possible to test those choices. This leads to obviousness. On the obviousness point, as I read the district court's opinion, as I read your opponent's arguments, they say basically, with respect to coding, you had two choices. That's all. You could either code it enterically or you could have it delayed dissolving. Immediate release. And that's all the choice was. So there were only two choices. And therefore, that comes within the standard of obviousness. I agree that is the argument. And that argument... What is the flaw in it? The flaw in the argument is the standard is predictable solutions. Would the skilled person be able to predict the solution to the problem to be solved in advance? That is the standard KSR articulates. It matters not if there were 10 choices, but each represented a predictable solution to the problem to be solved. That would be obvious. Also, if there were only two choices, but the prior art doesn't teach the skilled person to predict success in advance, then it matters not that there are only two choices because the skilled person based on the prior art cannot predict in advance what's going to happen. And so in this case, the district court bought Barr's argument that if there are limited choices, that establishes obviousness. But the KSR opinion doesn't say finite choices. At page 1742, it speaks of a finite number of identified predictable solutions. And if you try one of the predictable solutions, and that leads to the anticipated success, then the invention is likely obvious. Here what we know is the skilled person under the district court's findings could not predict in advance whether the claimed formulation would work and be effective as an oral contraceptive. This is the fundamental legal error in the district court's opinion. And it's further informed by clear factual errors as well. The district court had an erroneous gram analysis because Barr led the district court to believe that there were two key prior art acid sensitive drugs that were micronized and worked just fine. So the district court in error thought these were exceptions to the general rule the district court acknowledged that micronizing an acid sensitive drug is uncertain and can lead to additional degradation, make things worse. The first drug is progesterone. The second drug is spironolactone. Progesterone is a progestin. It's a sex hormone. And there's nothing in the prior art concerning any oral contraceptive that's acid sensitive. Drosperinone is unique. So there's no prior art dealing with the problem of acid sensitivity for an oral contraceptive. And the district court thinks in error that there's a sex hormone, progesterone, that's related to drosperinone because Barr described drosperinone as a progesterone-like substance. So the court concludes in error, ah, we have an acid sensitive drug that is micronized and works and therefore is an exception to the prior art warning. The second drug is spironolactone. It's a diuretic. It removes water. Related to drosperinone because drosperinone is a derivative from spironolactone. And the court erred in finding that spironolactone was acid sensitive. And we show in our reply brief at page four to seven that Barr's proposed findings of fact suggested to the court that spironolactone was acid sensitive. And the court found in error that Alton, which is the pharmaceutical formulation textbook upon which both parties relied, that Alton taught that spironolactone was acid sensitive. Alton does not teach that spironolactone is acid sensitive. It simply says it's poorly water soluble. And it's well known that you can use micronization to address poor water solubility. But that will make worse acid sensitivity and lead to more degradation. The next error is that the district court concluded enteric coding is an insurmountable obstacle to using an oral contraceptive because the enteric coding gives rise to variability in bioavailability. Where bioavailability is the amount of the active drug that gets into the system and is available to do the therapeutic work. This is clear error. There is no expert testimony in the record that enteric codings cause variability in bioavailability such that it's an insurmountable obstacle to an oral contraceptive. And Barr's answering brief cites no evidence to support this proposition. It's wrong. And moreover, for five years, Bayer-Shearing used enteric coded formulation in women, in clinical studies, and it was working just fine. PTX85 and PTX198. Yet the district court ignored the factual evidence that the enteric coding works and concluded in error that the enteric coding is an insurmountable obstacle. Now, the district court made this error because it was fundamentally confused between two different concepts. The first concept is variability in time to therapeutic onset, called variability in time to Cmax, maximum concentration of drug in the blood. And this is due to the varying gastric emptying time. Because if the drug stays in the stomach, with an enteric coded formulation, it won't release. It won't come out until it's in the intestine. The second concept is different. It's variability in bioavailability. That's how much of the drug ultimately gets into the system to do the therapeutic work. And the court confused these two different concepts. Perhaps the best evidence of this confusion is the discussion on page A49, where the court is first discussing variability in time to therapeutic onset. That's not a problem for a one-tablet-a-day oral contraceptive. But then draws conclusions about variability in bioavailability, which is totally different. And the block quote on page 49 that cites to Alton at page 170 is perhaps the best evidence of this confusion, where the first sentence from 170 concerns coded tablets, not enteric coded tablets. And the second sentence of that passage comes from 24 pages earlier in a completely separate section discussing a completely separate subject. And yet the court attributes it to page 170 and actually cut off the beginning of the sentence and changed the subject of the sentence. So this is just a reflection of the unreliability and confusion shown in the district court's opinion. And the reason this error on enteric coding is so important is it led the district court in error to find a motive for the skilled person to have to test an immediate release formulation against the prior art warning that if you micronize the acid-sensitive drug, you make things worse if you dissolve it in acid. So here, Bayer is entitled to a reversal because embracing the district court's fact-finding, if you apply the proper KSR standard of predictable solutions, the facts found show there was no predictable solution to the problem to be solved. And the district court only found obviousness because it lowered the standard to an obvious-to-experiment standard. Thank you. I'll reserve three minutes for rebuttal. Thank you. We will save your rebuttal time and we'll extend Mr. Lombardi's time by that amount also. May it please the court. The patent claims the most common formulation for an oral contraceptive. Sex steroids used in oral contraceptives are poorly soluble in water. The solution in every case is to micronize the poorly water-soluble sex steroid. They are all placed in an immediate release tablet, a non-enteric coded tablet, something that Bayer scientists and everybody else in the art refers to as a normal tablet. They work. It's in that context that plaintiffs make their claim. They make a claim for a routine formulation of an oral contraceptive that is well-known in the art. And the district court, in considering this, concluded that this was not the product of innovation, but was the product of common sense and routine techniques being applied. The court found that there was a reasonable expectation of success and properly applied the law. Plaintiff's argument, Bayer's argument here, is essentially that this court should disbelieve the 70 pages of factual findings in which all of the prior art was considered, all of the experts were considered, all of the evidence was considered and thoroughly discussed. But plaintiff Bayer faces a clearly erroneous standard and this court will not have a firm conviction that the district court got those facts wrong. As to the legal standard, which my colleague led with, the district court well understood the legal standard and properly applied it in this case. To make the argument that the legal standard was improperly applied requires that the district court opinion be taken in small pieces, sometimes less than a sentence pieces, and pulled out of context and make an argument that the reasonable expectation standard and the predictability standard were not applied. And let me point out to the court immediately where the reasonable expectation can be found. The district court's opinion was organized just the way an obviousness opinion should be organized. It talked about the law of obviousness. It talked about the scope of the prior art. It had a section comparing the prior art to the claimed invention. It went through an analysis of the prior art and the claimed invention and pointed out the differences and similarities. And then the district court came to opinions, to conclusions. At page 836, the district court started by talking about the necessity, accurately quoting KSR, the necessity of a finite number of predictable solutions. At A70, which is the page on which the conclusion appears, the district court repeated the language from KSR, specifically requiring that there be predictable solutions. And also, and also, in the section that begins conclusion, the district court specifically said, and I quote, a reasonable expectation of success, not absolute predictability, supports a conclusion of obviousness. That is exactly the standard that should be applied here. And after making that statement, the district court listed eight factual findings that it had made that supports the reasonable expectation of success in this case. So the district court clearly recognized the standard to be applied and clearly applied that standard in this case. Now, there are places throughout the opinion, as the district court discusses the opinion, where the district court makes reference to what happens after the reasonable expectation of success. For instance, that a person of skill in the art would go ahead and do the testing to confirm the reasonable expectation of success. But that is not inconsistent with the reasonable expectation of success as a legal standard to be applied in this case. But what's your answer to their argument that Byers' formulation scientist, when he started working in this area, spent all of this time doing something else, that is the interrogating because he didn't have an expectation of success. Now, that was an issue that was thoroughly litigated in the district court, Your Honor. Byers presented his formulation scientist, a man named Dr. Tack, who testified on the stand to what he did. And the district court specifically considered what we refer to in the case as the development path evidence in coming to its conclusions. What the district court concluded was that Byers' assertion, Byers' assertion that Dr. Tack's work was representative of what a person of ordinary skill in the art would have done, was not accurate, was not credible. And there are several reasons, and in the district court's opinion, the district court goes through seven, maybe eight different reasons why he did not find Dr. Tack's story credible in that regard. But one of the main reasons was that Dr. Tack was working at a different time than the person of ordinary skill in the art would have been working. Dr. Tack was working in the 1980s. The relevant date for purposes of obviousness in this case is a time of the application filing in 1999, and the district court concluded and cited to prior art that intervened during that period of time that Dr. Tack clearly couldn't have had access to. But possibly more importantly was the fact that Dr. Tack made a mistake. And Dr. Tack made a mistake by relying on a mathematical model that he called the compartment model to make his decision that enteric coding was necessary. That mathematical model was something that he had generated himself. It was not something that was available to a person of ordinary skill in the art. So that mathematical model, which Dr. Tack relied on to confirm his decision to enteric code, actually proved to be wrong and was not something that would have led the person of ordinary skill down the wrong path. As soon as Dr. Tack did a test, a single test in dogs with a non-enteric coded version of the drug, it worked and Bayer changed its development path completely, which the court took as an indication of an abrupt turnaround and an indication that Dr. Tack had made a mistake when he set down the path towards enteric coding. So the district court fully considered the development path testimony and evidence and gave it, in our view, the proper weight, which was no weight in determining the obviousness. Now, counsel has said in addition to the fact that the district court got the law wrong, which of course we disagree with, the district court made some substantial factual errors. And those factual errors are to be evaluated under the clearly erroneous standard, and in any event, did not exist and did not make it to the level of clearly erroneous. This case was essentially a teaching away case. And your honor, you are correct. There are essentially two choices here. If you had micronized drosperinone, you had a choice of enteric coding it on the one hand or not enteric coding it on the other hand. That's the finite choices under the KSR standard. In addition, the district court found that it would be predictable to use the non-enteric coded version, the immediate release version, to formulate drosperinone. We also found that it was not predictable whether, in fact, it would biodegrade before it was absorbed. That is how it would actually work in vivo. Is that accurate? No, that's not accurate. The district court actually found that you would have a reasonable expectation that it would absorb first and then isomerize, and I refer your honor to the opinion at A68. Where the court says that it refers to the Krause references that were specifically discussed by my colleague. Krause 1, 2, and 3 concern a closely related drug, spororinone, and it absorbed in vivo. Then the court says, together, the prior art recognizes that drosperinone does not need an enteric code. What the court recognized was that there was art out there that established a reasonable expectation that drosperinone would absorb before being isomerized in the human body and therefore would work for its intended purpose. Or a reasonable possibility. To agree with your theory, is a reasonable possibility sufficient to render it obvious? A reasonable expectation is sufficient to render it obvious, and that's what the court found. Now, that doesn't mean that somebody has to... Answer my question. I'm sorry? I apologize, your honor. If the prior art says there's a reasonable possibility that it will be absorbed before it degrades, is that sufficient to negate obviousness? No, I believe it has to be that the prior art is such that it gives a reasonable expectation to a person of skill in the art. And that is what the district court found here, is that the prior art gave a reasonable expectation to the person of skill in the art reading it. And I take it your answer to Judge Newman's question is that a reasonable possibility is not enough. It has to be a reasonable expectation. And if I wasn't clear, that is correct, your honor. I think that's what you were asking. Yes. And if all that the district court found was that the prior art gave a person of ordinary skill in the art a reasonable belief that there was a reasonable possibility of success, I agree. That is not sufficient for obviousness purposes. It needs to be... It was a reasonable expectation of success. That is correct. And that's what the district court, in fact, found, as I pointed out, at A70, and also on this particular point at A68, when the district court said together the prior art recognizes that Drosperinone does not need an enteric coat. A reasonable possibility, in your view, would excuse 15 years of going down the wrong path when following that reasonable possibility might have obviated it. If... I realize possibility is not in this case. That's correct. But are you sure you want to be that dogmatic about that answer? Well, your honor, I think that I have no hesitation in defending the district court's conclusion that a reasonable expectation of success... Well, you gave a definitive answer twice now about the possibility. I'm not sure why it came up, but it troubles me that you're so sure about it. Well, in this situation, the development path, your honor, didn't lead... was one in which the inventor was led astray by factors that weren't part of the prior art. For instance, the mathematical model that they relied on. For instance, the inventor did not have access to four different pieces of prior art that arose between the time he did his work and the time that the patent application was filed. That made the inventor different than the person of ordinary skill in the art at the time. And so the development path, the district court correctly concluded that the development path was not something that shed any light on the obviousness inquiry in this case. In other words, you don't want to answer my question. I apologize, your honor. That's your case, and we've heard it twice. That wasn't what I asked, but that's all right. I don't see it as in this case anyway, so go ahead and finish your argument. Your honor, I apologize for not being clear. Reasonable expectation is what I think is the standard and the standard that we met in this case. With acid sensitivity, your honor, there was discussion by counsel in his argument about progesterone and factual errors that were made by the court. To the extent that the acid sensitivity issue came up, it was in this context. The question that was being tried to the district court as put to the district court by Beyer was that an acid sensitive drug automatically would require enteric coating. That was the argument that was made by Beyer in the district court. And the district court correctly ruled, based on the facts that were provided, that acid sensitivity did not require enteric coating in all instances and was not an automatic. That was the context in which the findings related to progesterone were made. And the court had plenty of support for its conclusion concerning acid sensitivity not leading to enteric coating. The Krauss articles specifically dealt with a drug that was acid sensitive and considered the issue of whether it should be enteric coated, and the conclusion of the Krauss articles was that it did not need to be enteric coated. Didn't the prior art show that some, there's the example you mentioned, but that other acid sensitive drugs do need to be enteric coated? The evidence presented to the district court that said that was a general reference called the Alton reference, which both parties did refer to, and did make the statement that there are circumstances in which acid sensitive drugs do need to be enteric coated. But that's the general rule, the fact that there are exceptions of chemical compounds that you tell us are of similar structure. I don't recall the structures being in the record, but that are of similar structure that dissolve sufficiently slowly in acid that they're absorbed before they dissolve. I gather that's what you mean by acid sensitivity. Yes, acid sensitivity would refer to the tendency of the drug to isomerize in acid. So that the person of ordinary skill would know that in general drugs that are known to isomerize in acid need to be coated, but that there are exceptions, including an exception of a similar product. Is that right? Well, that is partially correct based on the record, Your Honor. What the record established was Alton did say that acid sensitivity could lead to enteric coating, but the record further established a number of drugs for which there was acid sensitivity, but no enteric coating. And in fact, Beyer never introduced to the court the name of a drug that was acid sensitive and did require enteric coating. So it was undisputed, for instance, that a number of- But that's what the textbook says. The textbook says- It's going to dissolve in the stomach before it gets into the bloodstream. Isn't that common sense, this is? It is common sense in the broad general scope in which Your Honor has just stated. That's true. But the facts that were presented to the court further laid out what the state of the art was with respect to acid sensitive drugs. And what the record was, was that there were a number of acid sensitive drugs that did not require enteric coating, and Beyer did not come forward with drugs that were acid sensitive but did require enteric coating. So the nature of the art was that acid sensitivity did not mandate or did not require automatically, as Beyer said, enteric coating. That is not what the art required, and that is what- If the drug's going both ways, that would require some experimentation to find out whether the particular drug you're working with did or did not require. Well, in this case, Your Honor, there was a specific piece of prior art that helped answer that question and provide the basis for the reasonable expectation. And that was the Krauss articles, where a particular compound that was closely related to drosperinone, the compound at issue here, the compound was called spororinone, was shown to be acid sensitive in an in vitro type of test. The authors of the article then did testing in vivo and determined that spororinone was not acid sensitive to a degree that caused isomerization before absorption in vivo. And so what the conclusion of that article was, which specifically centered around whether enteric coating was necessary, was that enteric coating was not necessary. And the district court considered spororinone, this article, the Krauss article, considered spororinone to be a closely related drug, and you'll see that in the findings of the court, went through seven different factors that indicated the similarity between spororinone and drosperinone, and found that that would have been instructive to the person of ordinary skill in the art in showing that drosperinone, there would be a reasonable expectation with drosperinone that there was no necessity for enteric coating. In fact, Krauss article, it was actually three articles. That was the first article, and then it was tested in humans in the first article. It was tested in humans in the third article, more humans in slightly different experimental conditions. And in the middle article, the second article, it was tested in monkeys. And it was tested at various rates, various dosages, various experimental conditions. And in each case, in each case, the authors found that there was no isomerization, and there was no problem with isomerization occurring before absorption. It was a different product. It was a different drug, but it was a closely related drug. It was a sex steroid. It was also, as was drosperinone, derived from the same drug. And it had a similar chemical structure being different in one chemical bond. The district court considered that it was different, but also noted the similarities and concluded that the similarities between the two products would give or assist in giving the person of ordinary skill in the art a reasonable expectation that the drug would work without enteric coating. Any more questions? Any more questions? Thank you, Mr. Lombardi. Ensign? I have three points. First, the fact that the district court recites a legal standard correctly does not require the Federal Circuit's intervention. We can look at the sentence about reasonable expectation of success and determine if it's a proper quote. What Bayer needs the Federal Circuit panel to do is scrutinize the analysis. It is not enough to recite the standard. It is necessary to apply the standard properly to the facts found. The district court recited the reasonable expectation of success standard on page A70. But then when you scrutinize the analysis that leads to the conclusion on A70, it's apparent that the district court did not find a reasonable expectation of success. It's possible to write a sentence that explicitly has a finding in it about reasonable expectation of success. Instead here, the district court could only say that the skilled person would have to experiment to see whether or not the claimed invention would work. And now we know, using hindsight, what that experiment would have shown. This is a reasonable possibilities standard. And that is not the law. That's why the district court erred in lowering the standard. And if you apply the proper standard, Bayer is entitled to judgment. The second point concerns this passage on A68 and the conclusion that the prior art recognizes drosperinone does not need an enteric coat. That only follows after the district court erroneously concludes that enteric coatings are an insurmountable obstacle to an oral contraceptive. That's what led the court to that conclusion. We know that because the court's specific discussion of the Krause references, which concern a different drug, spironone, the ultimate conclusion on Krause is that drosperinone may absorb, and that due to differences in dose and therapeutic indication, the skilled person would have to test. As we show in the graphic in our opening brief at page 57, this is at appendix 5944, due to the very high dose that was used in the spironone experiments and spironone's low solubility, only a very small percentage of the total dose was ever at risk of isomerizing in Krause's experiments. And he was dealing with a diuretic, not an oral contraceptive, whereas the claimed invention is a low-dose oral contraceptive. And that difference in dose and that difference in indication makes all the difference to the skilled person, and the district court recognized that. That's why the district court said, based on Krause, the skilled person would have to test and wouldn't be able to predict the outcome of the test in advance. Finally, Barr's position is that Tack was led astray, Bayer's inventor Tack. What Tack did was follow precisely the teaching of the prior art, that when you have a micronized, acid-sensitive drug, it's going to degrade even faster in acid, and the prior art teaches to protect it with an enteric coating. This is Alton, and on page 171, Alton teaches that using the enteric coating improves bioavailability because it protects against the enhanced acid degradation caused by the micronization. So initially, Tack, for five years, went down the predicted path until he had a surprising and unexpected result, which gave rise to the claimed invention. All of the art Barr relies upon was before the U.S. Patent Office, the examiner considered it, and properly found that the invention was not predictable in advance and was indeed an appropriate one for patenting. And for these reasons, we ask this court to reverse the decision of the district court. Okay. Any more questions? Thank you very much. Thank you, Mr. Basinger, and thank you, Mr. Lohmann.